# DECISIONS

OF THE

# UNITED STATES BOARD OF TAX APPEALS.

BOUCHER-CORTRIGHT COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6764.   Promulgated May 20, 1927.

1. A contribution of $500 held not to be deductible as an ordinary and necessary expense.

2. Claim for a deduction by reason of obsolescence or loss of useful value denied for want of evidence.

3. The petitioner purchased and used within the year, certain car wheels, axles and bumpers, and cast iron blocks, for use on mine cars. *Held* that the amounts so expended are deductible as ordinary and necessary business expenses.

4. The petitioner contends that it is entitled to have its depletion allowances computed on the basis of discovery value. *Held* that the evidence does not prove the discovery.

*Henry P. Erdman, Esq.,* for the petitioner.
*A. G. Bouchard, Esq.,* for the respondent.

In this proceeding the petitioner seeks a redetermination of its income and profits-tax liability for the year 1919, for which the Commissioner has determined a deficiency in the sum of $8,994.20. The petitioner alleges error on the part of the Commissioner: (1) In disallowing a contribution of $500 to St. Agnes Church of Beaverdale, Pa., as an ordinary and necessary expense; (2) in disallowing as a deduction for obsolescence or loss of useful value certain items amounting to $9,806.19; (3) in disallowing as ordinary and necessary expense an amount of $2,030 paid for mine-truck parts and bumpers; (4) in denying a depletion rate based on discovery; (5) in determining an insufficient allowance for depreciation on plant and equipment.

### FINDINGS OF FACT.

The petitioner is a corporation organized in January, 1917, for the purpose of mining coal near Beaverdale, Pa. During the year 1919 the petitioner donated $500 toward the building fund of a parsonage for the St. Agnes Church of Beaverdale. Beaverdale is a town of about 3,500 to 4,000 inhabitants who are for the most part

1

employees of the various coal-mining companies nearby. About 25 to 30 per cent of the mine employees were members of the Roman Catholic Church, which percentage also applied to the petitioner's employees. The St. Agnes Church was started several years prior to 1919 as a mission from Dunlow, a nearby town. A priest living at Dunlow made trips to Beaverdale to conduct services. The St. Agnes Church, desiring to have a priest permanently there, sought contributions to build a parsonage. Various mining companies were among the contributors.

In equipping its mine for operation the petitioner in the early part of 1917, installed six room hoists as an experiment. This experiment was a failure and the six hoists were replaced later by more permanent hoists.

During the year 1919 the petitioner purchased 25 sets of wheels and axles for mine cars for $1,590, 80 bumpers for $420, and 100 cast iron blocks at $20 each, a total of $2,030. These parts were used during the year 1919 to repair cars.

Petitioner acquired a lease from the Beaver Run Land Co., dated March 2, 1917, for the " D " seam of coal in a certain tract of land in Cambria County, Pa., consisting of something over 800 acres. The lease was secured through Cortright as stockholder, who was paid $10,000 by the petitioner for acquiring the lease. Under the terms of the lease petitioner acquired the right to take out all of the " D " seam of coal in the area leased upon payment of 6 cents a gross ton royalty, and with the further provision that a minimum of 20,000 gross tons should be paid for each year for five years beginning January 1, 1917, a minimum of 30,000 tons a year during the second five years, and a minimum of 50,000 tons a year thereafter until the " D " vein of coal was all mined and removed. The lease further provided that the petitioner should not be required to mine and remove any coal where the thickness was less than 2 feet, 6 inches, of clean, merchantable coal.

The leased property was located in what was known as the Wilmore Basin of coal, in a district in the southwestern portion of Cambria County, Pennsylvania, which basin was from 8 to 10 miles in width and 30 miles in length. The " D " seam of coal was a well recognized seam in this district and was known to exist on the leased property prior to the date of the lease, but it had never been commercially operated near Beaverdale. There were other seams of coal also known to exist and two of them, the " B " and " E," were being operated by other companies in 1917 in the same area that contained the petitioner's coal.

The " D " seam of coal outcrops on the leased property but the exposed coal is thin and of poor quality. A drift about 75 feet long

had been driven along the seam prior to January 1, 1917. Some house coal for local use was taken from this opening. The coal showed improvement inside this drift over that at the outcrop but commercial coal was not developed. In the fall of 1916 parties who later became stockholders of the petitioner began exploration work on this property, both by tunnels and drifts and also by diamond drilling. A corporation was organized for the purpose of exploring and operating this seam of coal in January, 1917. The lease on the " D " seam was dated March 2, 1917. The diamond drilling, consisting of from five to seven drill holes, was completed and the tunnel and drift had reached merchantable coal by May 1, 1917.

The mine opening to the coal was made through an old abandoned drift in a coal seam located above the " D " seam. This entry was used in order to avoid driving through broken and faulty areas. The coal exposed by this opening proved to be of commercial thickness and quality. The diamond drill holes also indicated coal of from 3 to 4 feet thick.

The engineering records obtainable in 1926 indicated that there were 773 acres of coal of the " D " seam included in the petitioner's lease. The coal varied from 2 feet, 6 inches, in the southerly and westerly portions to 4 feet in the northerly portion of the workings. The mine workings at that time extended over 427 acres of the 773 acres and showed an average thickness of 3 feet, 9 inches, resulting in an average content of 5,900 tons an acre. The recoverable coal was determined to be 83.3 per cent of the total, or 4,915 tons an acre.

After May 1, 1917, equipment and facilities, costing some $50,000, were installed for the purpose of mining and extracting the coal. This equipment was capable of handling 200,000 tons a year.

The plant and equipment, and facilities, were subdivided as follows:

Mine development, including siding facilities_____ $10,606.65
Frame buildings, including tipple, barns, blacksmith shop_____ 4,317.61
Mine equipment located inside the mine_____ 28,291.28
Nonmining equipment, including locomotive_____ 7,222.40

The mine equipment depreciated rapidly owing to the fact that the mine waters contained considerable sulphur. The life of items of equipment is as follows:

| Type of equipment. | Life. |
| --- | --- |
| Mine rope | 2 months to 1 year. |
| Mine rails | 5 years and over. |
| Locomotive | 8 years. |
| Cars | 8 years. |
| Large hoists | 10 to 15 years. |
| Small hoist | 1 year and over. |
| Electrical motors, small | 2 to 3 years. |

| Type of equipment. | Life. |
|---|---|
| Electrical motors, large | 10 to 12 years. |
| Motors on pumps | 8 years. |
| Motors on small pumps | 5 years. |
| Pumps | 2 to 3 years. |
| All bronze pumps | 8 years. |
| Frame buildings | 10 years. |

OPINION.

GREEN: Petitioner urges that it be permitted to deduct as an ordinary and necessary expense the amount of $500 contributed by it to the St. Agnes Church of Beaverdale to assist in the building of a parsonage, in order that a priest might be permanently located there. The evidence indicates that prior to the time the contribution was made the employees who were members of that church were not deprived of the opportunity to attend church or of having the services of a priest. The parsonage merely made such services more easily available. Nothing has been introduced to show that the petitioner would have suffered any business embarrassment or difficulties if the parsonage had never been built. We, therefore, believe that the contribution of $500 can not be classed as an ordinary or necessary expense of doing business.

The petitioner's claim for a deduction of $9,806.19 for obsolescence or loss of useful value is unsupported by any evidence. It has shown that $2,310 was expended for room hoists in 1917 and that subsequently such hoists had to be replaced. The record is silent as to the year of abandonment or disposal of such hoists or the salvage value thereof. Without such evidence we are unable to find that any deductible loss occurred.

During the year 1919 the petitioner purchased car wheels, axles, and bumpers, and cast-iron blocks, for use on mine cars. All of such parts and material so purchased were used during the year in repairing the mine cars then in use. The parts and materials thus purchased and used are of such a nature that the cost thereof may not, under the conditions here existing, be classed as a capital expenditure. Such expenditures are ordinary and necessary business expenses and the petitioner is entitled to a deduction therefor in 1919.

The petitioner claims that it is entitled to a discovery value and depletion based thereon with respect to the lease it acquired in 1917 on the " D " seam of coal. It has endeavored to show that no commercial quantity of coal has ever been found in this seam in the Beaverdale district prior to the time it acquired this lease. It is admitted that the " D " seam was known to exist on the property and that it had been operated in a small way. Various companies had prospected this seam within two or three miles of this property

but no commercial quantities of coal had been found. The parties interested in the organization of the petitioner apparently had the information that a faulty or broken condition of the " D " seam, designated the " trouble area," extended from the outcrop into the coal seam for only a limited distance and that beyond this "trouble area " would be found merchantable coal. This is borne out by the fact that the first underground work was carried on through old workings in another vein. The record also discloses that considerable prospecting work was done prior to the time the lease was acquired. A witness for the petitioner testified that he and his associates began drilling this property in the fall of 1916, having had some letters from the Beaver Run Land Co. agreeing to make the lease. He further testified that five or six diamond drill holes were put down and that drilling was completed around the first of May.

An examination of the map submitted discloses seven drill holes put down on this and the adjoining property and indicates three other drill holes designated " Penn. C. & C. Company," which company was operating the " B " seam 160 feet below the " D " seam. These three drill holes must have passed through the " D " seam and might have been a source of information to the petitioner. Since at least six drill holes were put down prior to May 1, 1917, and since drilling commenced in the fall of 1916, we assume that several drill holes were completed prior to the date of the lease and that on the date of the lease it was known that coal of commercial thickness and quality could be found in the " D " seam in this area.

The record further discloses that the petitioner paid an individual $10,000 for acquiring the lease, and that it agreed in the lease to pay minimum royalties amounting to $1,200 a year for five years, $1,800 a year for the next five years and $3,000 a year thereafter, and to pay for all coal extracted at the rate of 6 cents a ton.

All of these facts tend to indicate that the " D " seam was sufficiently proven on the date of the lease to be classed as a proven tract.

Even assuming that such was not the case, we do not have sufficient information before us to determine that there was a discovery as defined by the Revenue Act of 1918. No information has been submitted as to the dates the drill holes were put down or the results of such drilling. Without such information it would be impossible to determine the grade and quantity of coal in the property. The engineers testifying for the petitioner have not shown that the tonnage they used could have been determined from information available on May 1, 1917, or that it could not have been determined at an earlier date. All estimates of quantity appear to have been based, in part, on information acquired subsequent to May 1, 1917.

Section 234(a) (9) of the Revenue Act of 1918 provides:

In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: *Provided*, That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date: *Provided further*, That in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter; such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee.

The petitioner has failed to meet the requirements of this section. It has not proven that a discovery was made after the property was acquired, and has presented no evidence as to the fair market value on the alleged date of discovery or within thirty days thereafter. Accordingly, we are of the opinion that the petitioner has not established a discovery or a discovery value and is not entitled to depletion based on discovery.

The last issue has to do with the depreciation rates on plant and equipment. The petitioner's claim is as follows:

| Class | Cost | Rate, per cent | Amount |
|---|---|---|---|
| Mine development and facilities | $10,606.45 | 10 | $1,060.65 |
| Frame buildings | 4,317.61 | 10 | 431.76 |
| Inside mine equipment | 28,291.28 | 20 | 5,658.26 |
| Nonmining equipment | 7,222.40 | 12½ | 902.80 |
| Total | 50,437.74 | ---------- | 8,053.47 |

The Commissioner allowed a composite rate of 10 per cent on the total cost indicated above, which was the amount originally claimed by the petitioner on the return for the year 1919, and in addition allowed 10 per cent for one-half year on $19,022.24, designated " purchases " during 1919.

The petitioner sought to have depreciation determined upon the basis of the four classifications set forth above but failed to establish the proper rate for each of such classifications. The Commissioner. used a composite rate applicable to all depreciable property. The petitioner's method of subdividing the depreciable property into various groups or classes and applying a composite rate to each class is a more accurate method of determining depreciation, and had its

proof been complete as to all classes we would have accepted it as the better and more accurate of the two methods. However, it is incumbent upon a petitioner attacking a composite rate found by the Commissioner to establish by the correct composite rate the proper rate to be applied to all of the depreciable assets, and we must, therefore, affirm the Commissioner's action in this regard.

> *Judgment will be entered after 15 days' notice, under Rule 50.*